**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

HARDIN COUNTY SAVINGS BANK,
WALWORTH STATE BANK, EITZEN
STATE BANK, NORTHERN
NATIONAL BANK, KINDRED STATE
BANK and FIRST NATIONAL BANK,

        Plaintiffs,

vs.

CITY OF BRAINERD, HOUSING AND
REDEVELOPMENT AUTHORITY OF
THE CITY OF BRAINERD,
MARGARET TIPLADY, ALONA
MILLER, DOUG GROUT,
DOUGHERTY & COMPANY, LLC,
JOHN MACDONALD, THOMAS
WILDER, and JAMES H. BEDARD,
INC.,

        Defendants.

No. 08-CV-38-LRR


**ORDER**

_____

*TABLE OF CONTENTS*

**I.   INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

**II.  RELEVANT PROCEDURAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . **2**

**III. SUBJECT-MATTER JURISDICTION** . . . . . . . . . . . . . . . . . . . . . . . . . **4**

**IV.  FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
    **A.  *Parties*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
        **1.  *Plaintiffs*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
        **2.  *Defendants*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
    **B.  *Development Plans*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
    **C.  *Bonds*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
    **D.  *Appraisal*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
    **E.  *Study*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**

| | | | |
|---|---|---|---|
| F. | *Memorandum and Mortgage* | .......................... | **8** |
| G. | *Purchase of Bonds* | ................................ | **9** |
| H. | *Project* | ...................................... | **9** |
| I. | *2007 Appraisal* | ................................ | **9** |
| J. | *Default* | ...................................... | **10** |
| **V.** | **ARGUMENTS** | ..................................... | **10** |
| **VI.** | **ANALYSIS** | ....................................... | **12** |
| A. | *Failure to State a Claim: Legal Standard* | .................. | **12** |
| B. | *Loss Causation* | ................................ | **13** |
| | 1. *Applicable standard* | ........................... | **14** |
| | 2. *Application of* **Schaaf** *and* **Dura** | .................. | **16** |
| | 3. *Plaintiffs' Resistance* | .......................... | **18** |
| C. | *Miscellaneous Arguments as to Federal Securities Claims* | ....... | **20** |
| D. | *Supplemental Subject-Matter Jurisdiction* | ................... | **20** |
| E. | *Miscellaneous Motions* | ............................ | **21** |
| **VII.** | **CONCLUSION** | ..................................... | **21** |

## I. INTRODUCTION

The matters before the court are: (1) "Motion to Dismiss by Defendant City of Brainerd, or in the Alternative, for Change of Venue" ("City's Motion") (docket no. 34); (2) "Defendant Bedard's Motion to Dismiss or in the Alternative for Transfer of Venue" ("Bedard's Motion") (docket no. 36); (3) "Defendants Dougherty & Company LLC, John MacDonald and Thomas Wilder's Motion (1) To Transfer Venue and (2) To Dismiss Plaintiffs' Claims" ("Dougherty's Motion") (docket no. 37); and (4) "Defendants Brainerd Housing and Redevelopment Authority, Alma Miller, Margaret Tiplady and Doug Grout's Motion to Dismiss—and Joinder in other Defendants' Motions" ("Authority's Motion") (docket no. 38) (collectively, "Motions").

## II. RELEVANT PROCEDURAL BACKGROUND

On April 18, 2008, Plaintiffs Hardin County Savings Bank, Walworth State Bank, Eitzen State Bank, Northern National Bank, Kindred State Bank and First National Bank filed a Complaint (docket no. 1) against Housing and Redevelopment Authority of the City

of Brainerd (the "Authority"), Alona Miller[1], Margaret Tiplady, Doug Grout, the City of Brainerd (the "City"), Dougherty & Company, LLC ("Dougherty"), John MacDonald, Thomas Wilder, and James H. Bedard, Inc. ("Bedard"). The Complaint alleges three categories of claims: (1) securities fraud in violation of 15 U.S.C. § 78j(b) against the Authority, Dougherty, MacDonald, Wilder and Bedard (Counts I, XIII, XVI and XXI); (2) control person securities fraud in violation of 15 U.S.C. § 78t against the City, Tiplady, Miller and Grout (Counts VI and IX); and (3) various state-law claims against Defendants, including violations of Iowa and Minnesota[2] securities laws (Counts II, III, IV, V, VII, VIII, X, XI, XII, XVII, XVIII, XIX, XX, XXII, XXIII and XXIV).[3]

On June 23, 2008, Defendants filed the Motions. On July 10, 2008, Plaintiffs filed an omnibus resistance to the Motions ("Resistance") (docket no. 49). On July 18, 2008, the Authority, Tiplady, Miller and Grout filed a Reply (docket no. 53). On July 21, 2008, the City filed a Reply (docket no. 54), Dougherty, MacDonald and Wilder filed a Reply (docket no. 55) and Bedard filed a Reply (docket no. 56). All parties requested oral argument on the Motions. Pursuant to Local Rule 7.c, the court finds the Motions do not necessitate oral argument and, accordingly, denies the parties' requests for the same. The court finds the Motions fully submitted and ready for decision.

---

[1] According to Miller, the Complaint misstates her first name as "Alona" instead of "Alma." Authority's Motion at 1, n.1.

[2] In the Complaint, Plaintiffs raise their Minnesota securities claims under the former version of Minnesota's securities laws. Effective August 1, 2007, these statutes were replaced with new versions. Laws 2006, c. 196, art. 1, § 51.

[3] On July 10, 2008, Plaintiffs dismissed Count XIV of the Complaint. Notice (docket no. 47). That same day, Plaintiffs dismissed Defendants James Alderman, Ernest Wozniak and Fred Melgard from the Complaint. Notice (docket no. 46). On July 17, 2008, Plaintiffs dismissed Count XV of the Complaint. Notice (docket no. 52).

## III.  SUBJECT-MATTER JURISDICTION

The court finds that it has federal question jurisdiction over Plaintiffs' securities claims.  *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States").  The court may exercise supplemental jurisdiction over Plaintiffs' remaining state law claims because they are so related to the claims over which the court has federal question jurisdiction that they form part of the same case or controversy.  *See* 28 U.S.C. § 1367(a) ("[T]he district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy[.]").

## IV.  FACTS[4]

### A.  Parties

#### 1.  Plaintiffs

Plaintiffs are a group of banks that purchased the securities at issue in the instant action.  Hardin County Savings Bank is an Iowa corporation with its principal place of business in Eldora, Iowa.  Walworth State Bank is a Wisconsin bank with its principal place of business in Walworth, Wisconsin.  Eitzen State Bank is a Minnesota bank with its principal place of business in Caledonia, Minnesota.  Northern National Bank is a Minnesota bank with its principal place of business in Baxter, Minnesota.  Kindred State Bank is a North Dakota bank with its principal place of business in Kindred, North Dakota.  First National Bank is a Minnesota bank with its principal place of business in Wadena, Minnesota.

---

[4] For purposes of the Motion, the court views the allegations in the light most favorable to Plaintiffs and affords them all reasonable inferences.  *See Romak USA, Inc. v. Rich*, 384 F.3d 979, 981 (8th Cir. 2004) (reviewing motion to dismiss).

### 2. *Defendants*

The City is a municipality organized under the laws of Minnesota. The Authority is a municipal entity created by the City. The Authority and the City are distinct and separate entities. The Authority is empowered to transact business in the City. The City appoints the Authority's directors. Tiplady and Miller are directors of the Authority and citizens of Minnesota. Grout is the Executive Director of the Authority and is a citizen of Minnesota. Dougherty is a Delaware corporation with its principal place of business in Minneapolis, Minnesota. MacDonald and Wilder are "registered representatives" employed by Dougherty and are citizens of Minnesota. Complaint at ¶¶ 17 & 18. Bedard is a Minnesota corporation with its principal place of business in Brainerd, Minnesota.

### B. *Development Plans*

In 2002, a developer sought to develop approximately forty acres of real estate in the City into single-family homes. The developer approached the City about obtaining tax incremental financing ("TIF") for 86 of the 96 lots in the development. "TIF is a method of financing public or private improvements that are needed to serve a new development." *Id.* at ¶ 27. The developer sought a total of $806,000 in TIF benefits. The City established a TIF district for this developer, but only for 20 single-family homes.

### C. *Bonds*

On August 25, 2003, the City approved a resolution authorizing the issuance of General Obligation Improvement Bonds ("G.O. Bonds"), which included $1,085,000 for improvements for the developer's project ("Project"). The City's meeting minutes reflect the City's funds would pay for the G.O. Bonds, but ultimately, the developer—not the City's taxpayers—would pay for the improvements to the Project. Although the City approved a resolution authorizing the issuance of the G.O. Bonds, it did not at that time issue the G.O. Bonds.

The Authority later assumed the Project from the developer. The Authority planned

to issue taxable revenue bonds ("Bonds") to acquire and improve the real estate. "Taxable revenue bonds are commonly sold by municipal entities, such as [the Authority], to the public to finance private projects that serve public needs." Complaint at ¶ 35. Later, the issuing municipality entity repays these funds through "a dedicated revenue stream from the issuer's project financed with the proceeds of the bond." *Id.*

In preparation for issuance of the Bonds, the Authority retained Dougherty as an underwriter. An underwriter, usually an investment banking firm, "provides financial advice with respect to the bond issue" and is responsible "for causing the issuance to be sold." *Id.* at ¶ 36. Dougherty was charged with preparing a Private Offering Memorandum ("Memorandum") "pursuant to which [the Authority] offered to sell $3.3 million [in Bonds] with the proceeds to be used to acquire and improve the [Project]." *Id.* at ¶ 37. The Project consisted of 96 residential lots and included the construction of two model homes.

At the conclusion of this planning, the Project stood as follows:

> [The developer's] Project Manager was retained as a consultant for the company that would build the two model homes, the City would have real estate to specially assess to finance its issuance of [G.O.] Bonds, and [the Authority] would issue Bonds that improperly shifted the risk of the Project from [the developer], the City and [the Authority], to Plaintiffs, who purchased Bonds to be issued by [the Authority].

*Id.* at ¶ 38.

Dougherty's employees, MacDonald and Wilder, told Plaintiffs "that in all likelihood the Bonds would mature before a sufficient number of lots were sold to pay-off such Bonds and therefore the City would not allow [the Authority] to default on the Bonds because it would harm the City's ability to finance bonds in the future." *Id.* at 39.

### D. Appraisal

Dougherty and the Authority retained Bedard to complete an appraisal ("Appraisal")

of the Project. The Appraisal "was specially designed to be relied upon by [Plaintiffs] to induce their purchase of the Bonds." *Id.* at ¶ 43. The Appraisal stated the population in and around Brainerd was growing and the G.O. Bonds issued by the City would allow the developer to have more favorable financing than would have otherwise existed. As for the value of the Project, the Appraisal stated the average site value was $36,500, which "*takes into account the improvements* such as streets, utilities, sidewalks, plantings in addition to the existing approvals, bonding and [TIF]." *Id.* at ¶ 46 (emphasis in original). "After determining the value of individual improvements and common improvements, the average site value was adjusted upward to $43,386." *Id.* at ¶ 47. "That meant that the 94 residential lots were worth $4,078,284." *Id.* The Appraisal discounted that amount for a four-year selling period, plus selling expenses and a 7% discount rate, to a present value of $3,282,670. The cash flow schedule provided by the Appraisal was based on a 4, 5 and 7-year "absorption rate." An absorption rate is the ability of a real estate market to sell off houses for sale. The Appraisal "was based on flawed absorption and discount rates," "failed to properly account for developer costs," and inconsistently listed the price of a lot as $30,854 with a value of $43,386. *Id.* at ¶ 51. In sum, the Appraisal overstated the value of the collateral securing the Bonds by at least $1 million.

### E. Study

Bedard also prepared a feasibility study ("Study") of the Project, which was intended to be relied upon by Plaintiffs. The Study concluded it was "a very achievable plan" to sell all the lots in the development within a seven-year period. *Id.* at ¶ 54. The Study "was flawed and failed to properly analyze and disclose economic facts," such as "the significant adverse impact the $1,085,000 special assessments levied against the lots would have on the ability to sell the lots." *Id.* at ¶ 55. The cash flow schedule reflected a lot price of $30,854, but failed to add the $11,262 cost per residential lot for the special assessment, which made the cost of the lot from a buyer's perspective at least $42,116.

### F. Memorandum and Mortgage

The Memorandum stated the total appraised "value of the Project was $4,127,670, including 94 residential lots, 2 model homes and 2 commercial lots."[5] *Id.* at ¶ 58. The Memorandum stated the G.O. Bonds would "be repaid by special assessments levied against the lots," and "will be required to be in connection with the sale of each lot." *Id.* at ¶ 59. However, the Memorandum failed to disclose a cost of $11,262 for the special assessment to be levied against each of the residential lots for the G.O. Bonds. The Memorandum did not adequately address the cost of a residential lot from a buyer's perspective, which, in actuality, ranged from $42,116 to $46,184. "Such a price for a lot is an unrealistically high price for moderate-income buyers in Brainerd and materially impacted the feasibility of lot sales over a seven-year period." *Id.* at ¶ 62. Because the buyers would have to repay both $3.3 million in Bonds along with $1,085,000 in special assessments for the G.O. Bonds, the Project was not economically viable at the time the Bonds issued. The predicted sale of fourteen lots per year "was virtually impossible." *Id.* at ¶ 64.

On November 1, 2003, an Indenture of Trust was entered into between U.S. Bank National Association as a Trustee for Plaintiffs ("Trustee"). That same day, the Authority and the Trustee entered into a Mortgage, Assignment of Rents, Security Agreement and Fixture Financing Statement ("Mortgage"). Pursuant to the Mortgage, the Authority agreed to pay "<u>all taxes and assessments and all other charges whatsoever levied upon or assessed and placed against the mortgaged property</u>, except that assessments may be paid in installments so long as no fine or penalty is added to any installments for nonpayment thereof." *Id.* at ¶ 67 (emphasis in original). The Mortgage led Plaintiffs to believe the Authority would pay accrued taxes and special assessments on the lots until they were sold

---

[5] The court assumes that, at some point, the Project plans evolved to consist of 94 residential lots and 2 commercial lots instead of 96 residential lots.

to buyers.

### G. Purchase of Bonds

Relying on "oral representations," the Memorandum, Appraisal, Study and Mortgage, Plaintiffs purchased all $3,300,000 of the Bonds issued by the Authority. *Id.* at ¶ 70. The Bonds were set to mature on December 1, 2006.

### H. Project

In 2004, two model homes were built for the Project and no lots were sold. In 2005, one model home and one lot were sold. On June 10, 2005, the Authority and Plaintiffs amended the Indenture of Trust to waive certain tax obligations and allow the issuance of a note in excess of $2,150,000 to finance the construction of 10 single-family homes for the Project. This effort was intended to "jump start" the project. *Id.* at ¶ 76. Plaintiffs agreed to this plan "because required payments would be made and the proposal would best protect their investment and collateral." *Id.* at ¶ 77. No lots or homes sold in 2006.

On December 11, 2006, Plaintiffs made a "call" on the Bonds. *Id.* at ¶ 80. On February 20, 2007, due to poor sales and inflated lot prices, the City approved the expansion of the TIF district. On March 19, 2007, the City authorized the issuance and sale of $4,925,000 of G.O. Bonds, which were intended to be used to repay $2.74 million owed to Plaintiffs. At this time, the City did not issue the G.O. Bonds because a public hearing was required to be held first.

### I. 2007 Appraisal

On April 12, 2007, a new appraisal was prepared by a third party for the City ("2007 Appraisal"). The 2007 Appraisal stated the value of the 83 remaining lots (after taking into account the two sold lots, model home and other lots the Authority purchased), was only $530,000. The 2007 Appraisal stated the value of the 83 lots decreased in excess of 82% in less than four years, meaning the total amount of lost value was $2,368,527.

The 2007 Appraisal stated "as of April 12, 2007, the unpaid balance for prior assessments was $551,729 and for 2007 was $128,996.41." *Id.* at ¶ 88. As of April 12, 2007, each lot was encumbered with a special assessment of $7,500 along with current taxes and special assessments of $14,638. The difference in value between Bedard's Appraisal and the 2007 Appraisal was due to "Bedard's failure to properly account for the impact on the ability to sell lots based on the special assessments and taxes." *Id.* at ¶ 90.

### J. Default

On April 16, 2007, the City rejected the issuance of G.O. Bonds intended to repay the amount owed to Plaintiffs. At that time, a council member of the City stated "the risk of loss should be placed on [Plaintiffs]." *Id.* at ¶ 94. On May 15, 2007, the Trustee informed Plaintiffs "that a required bond payment would be made by [the Authority]." *Id.* at ¶ 95. However, on November 16, 2007, the Authority gave notice of its default to the Trustee and Dougherty, claiming it did "not have the ability to repay the bond obligation due to a 'significant downturn' in market conditions." *Id.* at ¶ 97. Plaintiffs do not believe a market downturn was responsible for the Authority's default because, "[t]he construction and sale of new home sales in 2004 and 2005 were among the strongest years in history in Minnesota and in Brainerd." *Id.* at 98. The Authority did not make any payments on real estate taxes or special assessments levied against the Project.

### V. ARGUMENTS

Defendants argue the court lacks personal jurisdiction over certain defendants, venue is improper or otherwise more conveniently situated in the United States District Court for the District of Minnesota and Plaintiffs have failed to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). However, the court need only consider the parties' Rule 12(b)(6) arguments.[6]

---

[6] Plaintiffs argue the court has personal jurisdiction and venue over Defendants
(continued…)

In the City's 12(b)(6) Motion, the City argues (1) Plaintiffs failed to allege the City is a "control person"; (2) the City has not engaged in culpable participation; (3) the Complaint fails to plead sufficient facts to show loss causation under *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 550-53 (8th Cir. 2008); and (4) Plaintiffs' Minnesota and Iowa claims fail as a matter of law. In Bedard's Rule 12(b)(6) argument, Bedard (1) joins the City's loss causation argument; and (2) argues Plaintiffs failed to sufficiently plead aider and abettor liability. In Dougherty's 12(b)(6) Motion, Dougherty, MacDonald and Wilder (1) join the City's Motion as to loss causation; and (2) argue Plaintiffs failed to plead their federal securities claim with the requisite specificity as to MacDonald and

---

[6](...continued)
pursuant to section 27 of the Securities Exchange Act (15 U.S.C. § 78aa), which provides, in pertinent part:

> Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder [. . .] may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.

15 U.S.C. § 78aa. In a nutshell, "[Section 78aa] confers personal jurisdiction over a defendant who is served anywhere within the United States." *Kidder, Peabody & Co., Inc. v. Maxus Energy Corp.*, 925 F.2d 556, 562 (2d Cir. 1991), *cert denied*, 501 U.S. 1218 (1991) (citing *Steinberg & Lyman v. Takacs*, 690 F. Supp. 263, 265 (S.D.N.Y. 1988)). In order for the court to determine whether this special venue and jurisdiction statute applies, the court must necessarily determine whether Plaintiffs properly pleaded the underlying federal securities fraud claims upon which this jurisdiction and venue statute is premised. Because Plaintiffs failed to properly plead their federal securities claims, the court need not address this special jurisdiction and venue provision. Further, the court declines to exercise supplemental subject-matter jurisdiction over the remaining state law claims, thereby dismissing the Complaint in its entirety. Therefore, traditional analysis of venue and personal jurisdiction for purposes of the Motions is unnecessary.

Wilder. The Authority's 12(b)(6) Motion contends (1) Plaintiffs failed to adequately plead loss causation; (2) Plaintiffs failed to attribute a misstatement or omission to the Authority, Tiplady, Miller and Grout; (3) Plaintiffs failed to plead a strong inference of scienter; and (4) Plaintiffs cannot establish reliance.

## VI.  ANALYSIS

The court begins its analysis by considering the portions of the Motions seeking to dismiss the federal securities claims pursuant to Federal Rule of Procedure 12(b)(6). Plaintiffs pleaded two sets of securities violations: one against Bedard, the Authority, Dougherty, MacDonald and Wilder as primary violators, and one against the City, Miller, Tiplady and Grout as control persons, or secondary violators. Primary violator liability arises under 15 U.S.C. § 78(j). Assuming all other requirements are satisfied, primary violator liability arises when a person "effect[s] a short sale," uses "any stop-loss order in connection with the purchase or sale" or employs "any manipulative or deceptive device or contrivance" in connection with a securities transaction. 15 U.S.C. § 78j(a)(1) & (b). Control person liability, on the other hand, arises under 15 U.S.C. § 78t. This provision "is designed to ensure that securities brokers act properly and supervise their employees and [. . . it] imposes liability in those cases in which the supervisor did not directly participate in the bad acts." *In re Miller*, 276 F.3d 424, 429 (8th Cir. 2002) (citing *Metge v. Baehler*, 762 F.2d 621, 631 (8th Cir. 1985)).

### A.  Failure to State a Claim: Legal Standard

Federal Rule of Civil Procedure 12(b)(6) authorizes a district court to dismiss a claim for a "failure to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). In assessing a motion to dismiss, the court must view the allegations in the complaint in the light most favorable to the non-moving party. *In re Operation of Mo. River Sys. Litig.*, 418 F.3d 915, 917 (8th Cir. 2005). The court must accept all the factual allegations in the complaint as true. *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007)

(citing, in part, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n.1 (2002)). "Rule 12(b)(6) does not countenance [. . .] dismissals based on a judge's disbelief of a complaint's factual allegations." *Neitzke v. Williams*, 490 U.S. 319, 327 (1989). "The plaintiffs need not provide specific facts in support of their allegations, but they must include sufficient factual information to provide the 'grounds' on which the claim rests, and to raise a right to relief above a speculative level." *Schaaf*, 517 F.3d at 549 (citing *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 & n.3 (2007)) (internal citations omitted).

The Private Securities Litigation Reform Act ("PSLRA") (15 U.S.C. § 78u-4(b)(3) (1998)) ( requires a plaintiff's allegations of falsity to "satisfy two heightened pleading standards." *In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1083 (8th Cir. 2005) (citing 15 U.S.C. § 78u-4(b)(3)). To satisfy the PSLRA's heightened standards, a plaintiff must plead as follows:

> First, the plaintiff must plead falsity by specifying each allegedly misleading statement and the reasons why each statement is misleading. If falsity is alleged based upon information and belief, the complaint must state with particularity all facts on which the belief is formed. In addition, the plaintiff must plead scienter by stating with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind.

*Id.* (internal quotations, citations and alterations omitted). The court also considers "plausible opposing inferences" in determining whether the pleaded facts establish a strong inference of scienter." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007).

### B. Loss Causation

All Defendants argue the court should dismiss Plaintiffs' federal securities claims (Counts I, VI, IX, XIII, XVI and XXI) pursuant to Rule 12(b)(6) because Plaintiffs failed to adequately plead loss causation.

## 1. *Applicable standard*

"Loss causation [. . .] corresponds to the common law's requirement of proximate causation." *Schaaf*, 517 F.3d at 550 (citing *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172-73 (2d Cir. 2005)). "In a securities case, this standard requires the plaintiff to show that the defendant's fraud—and not other events—caused the security's drop in price." *Id.* This showing is required because

> the security's "lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price."

*Id.* (quoting *Dura Pharm, Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). Loss causation is distinguished from transaction causation, which requires a plaintiff to "show that the defendant's fraud induced the plaintiff to purchase the security." *Id.* (citing *Harris v. Union Elec. Co.*, 787 F.2d 335, 367 (8th Cir. 1986)). Stated another way, to prove transaction causation, a "plaintiff must show that but for the misrepresentation, [the plaintiff] would not have purchased the security." *Id.*

*Schaaf* requires a securities fraud complaint to "'provide a defendant with some indication of the loss and causal connection that the plaintiff has in mind.' Otherwise, a plaintiff with no hope of showing proximate causation could require inefficient expenditure of resources and potentially induce a defendant to settle a meritless claim." *Id.* (quoting *Dura*, 544 U.S. at 347). To prevail, a plaintiff must plead "that the loss was foreseeable and caused by the materialization of the concealed risk." *Id.* at 552 (citing *Lentell*, 396 F.3d at 173). A complaint must allege the plaintiff's securities decreased in value after the truth about the securities was revealed; that is, a plaintiff must show a loss of value in the securities followed a revelation of the misrepresentation or omission at issue. *Dura*, 544 U.S. at 347; *see also In re Retek Inc. Sec. Litig.*, No. CIV 02-4209(JRT/SRN), 2005 WL

3059566, *3 (D. Minn. Oct. 21, 2005) (observing, absent a "corrective disclosure" revealing the fraud, "a subsequent fall in stock value cannot be causally connected to the alleged fraud"); *cf., In re Bally Total Fitness Sec. Litig.*, No. 04 C 3530, 2006 WL 3714708, *14 (N.D. Ill. July 12, 2006) (distinguishing *Dura* because complaint alleged "that when truth became known [. . .], the price of Bally stock 'fell precipitously' and, as a result, plaintiffs suffered economic loss").

*Schaaf* cites extensively to recent Supreme Court precedent in *Dura*, 544 U.S. 336. In a footnote, Plaintiffs argue the court should refrain from relying on *Dura* and, by extension, *Schaaf*, because "[i]t is recognized that *Dura* provides little, if any guidance, with respect to what a complaint outside of a fraud-on-the-market[7] case must contain." Resistance Brief (docket no. 49-4), at 22, n.10. In support of this argument, Plaintiffs cite *Schuster v. Anderson*, 413 F. Supp. 2d 983 (N.D. Iowa 2005) (Bennett, C.J.) and *Livid Holdings Ltd v. Salomon Smith Barney, Inc.*, 416 F.3d 940 (9th Cir. 2005). As an initial matter, the court notes Plaintiffs' reliance on *Schuster* and *Livid Holdings* is unavailing, since both of these decisions are non-binding and predate the Eighth Circuit Court of Appeals's decision in *Schaaf*. More to the point, the court finds *Schaaf* demonstrates an application of *Dura* in cases outside the fraud-on-the-market context, since it followed and applied *Dura* in a case involving a private sale of bonds comparable to those at issue in the instant action. *Schaaf*, 517 F.3d at 550; *see also McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 433 (3d Cir. 2007) (finding *Dura* "persuasive" in case outside fraud-on-the-market context). Additionally, *Schaaf* observed loss causation in securities cases "does not differ from that employed in a common law fraud case." *Id.* (citing *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 683-85 (7th Cir. 1990)). The court also notes *Dura* and *Schaaf*

---

[7] In a fraud-on-the-market case, "'materially misleading statements have been disseminated into an impersonal, well-developed market for securities[.]'" *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 321 (8th Cir. 1997) (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 247 (1988)).

do not indicate their holdings are limited to fraud-on-the-market cases. Accordingly, the court shall apply *Schaaf* and *Dura* as the relevant standard for purposes of the Motions.

Plaintiffs also rely on *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824 (8th Cir. 2003), another decision predating *Dura* and *Schaaf*. *Gebhardt* held "[p]aying more for something than it is worth is damaging" and sufficient to establish loss causation. *Gebhardt*, 335 F.3d at 831. This holding conflicts with the Supreme Court's more recent decision in *Dura*, which held the allegation of price inflation alone is insufficient for purposes of pleading loss causation. *Dura*, 544 U.S. at 347. In light of controlling Supreme Court precedent in *Dura* and the Eighth Circuit Court of Appeals's application of *Dura* in a case similar to the instant action, the court will not consider the mere allegation of price inflation sufficient for pleading loss causation.

### 2. *Application of* Schaaf *and* Dura

Because the court finds *Schaaf* and *Dura* applicable, it now turns to determine whether Plaintiffs adequately alleged loss causation in the Complaint. In *Schaaf*, the Eighth Circuit Court of Appeals held the complaint failed to adequately plead loss causation because the plaintiffs did not allege their losses were "caused by the materialization of the concealed risk[.]" *Schaaf*, 517 F.3d at 552 (citing *Lentell*, 396 F.3d at 173). Plaintiffs have also failed to make this allegation. At no point in the Complaint do Plaintiffs allege facts stating or inferring Defendants' misrepresentations or omissions caused Plaintiffs' loss, or that the alleged fraudulent acts or omissions caused the devaluation of the Bonds or collateral. Instead, the Complaint is replete with allegations stating or suggesting the Bonds were overpriced at the time of purchase due to Defendants' fraud. This is insufficient for purposes of establishing loss causation. *Dura*, 544 U.S. at 347.

Missing from the Complaint is an allegation indicating when or how Defendants' fraudulent acts "materialized," or how the revelation of Defendants' fraudulent acts set

into motion the devaluation of the Bonds securing the collateral. The Complaint states approximately four years passed between Plaintiffs' purchase of the Bonds and the Authority's default on the Bonds. Plaintiff failed to plead Defendants' fraud "materialized" at any point during this four-year-period. Indeed, in June of 2005, Plaintiffs amended the Trust to "jump-start" the Project due to slow sales, despite a booming real estate market preceding that amendment. Although this may have given Plaintiffs a clue as to the existence of Defendants' fraud, Plaintiffs did not plead this amendment brought Defendants' fraud to light or triggered the devaluation of the Bonds.

The absence of an event triggering the devaluation of the Bonds makes an inference of loss causation nearly impossible; without even a materialization of the fraud, it is unclear how the fraud, and not another factor, could have devalued the Bonds. The closest Plaintiffs come to alleging materialization of the fraud occurs when they first refer to the 2007 Appraisal. The 2007 Appraisal revealed the collateral securing the Bonds had devalued substantially since the time of the Appraisal; however, it does not reveal when or how the devaluation occurred. Even if the court assumed Plaintiffs intended to plead the 2007 Appraisal as the "materialization" of the fraudulent omissions, the 2007 Appraisal did not trigger the devaluation—the devaluation occurred prior to the preparation of the 2007 Appraisal. Without any allegations suggesting it, the court cannot infer the Bonds decreased in value following the 2007 Appraisal. There is simply no other allegation from which the court can infer Plaintiffs' fraud caused the Bonds to decrease in value. In summary, Plaintiffs failed to plead a causal relationship between the devaluation of the Bonds and Defendants' fraudulent acts.

### 3. Plaintiffs' Resistance

In the Resistance, Plaintiffs argue certain facts alleged in the Complaint adequately allege causation loss. The court addresses each of these facts, in turn.

First, Plaintiffs identify the allegations stating Bedard and Dougherty's unreasonable

omissions and representations overvalued the real estate at issue, which "was essentially the sole asset to repay [Plaintiffs], due to [the Authority's] meager tax authority and the City's refusal to pledge its general taxing power." Resistance Brief at 23. Second, Plaintiffs argue that, if the "true value" of the real estate had been disclosed and due diligence had been performed, the "Project would have been revealed as not being viable" prior to the sale of the Bonds. *Id.* At best, these facts suggest Defendants' misrepresentations and omissions caused Plaintiffs to purchase the Bonds. Because these facts merely state why and how Plaintiffs purchased the securities—not why or how Plaintiffs suffered losses—they allege transaction causation, not loss causation. *Schaaf*, 517 F.3d at 550. Additionally, these allegations do not suggest or imply Defendants' omissions and misrepresentations caused Plaintiffs to suffer damages. Instead, they merely indicate the price of the Bonds was inflated at the time of purchase. Inflated purchase price alone is insufficient for securities fraud pleading purposes. *See Dura*, 544 U.S. at 347.

Third, Plaintiffs argue the Complaint states: "It was foreseeable that the Appraisal, [Study . . .,] Memorandum [and] due diligence which was highly unreasonable and departed from standards prior to the sale of the [B]onds would cause [Plaintiffs] loss by the materialization of the concealed risk." Resistance Brief at 23-24. The allegation concerning the "materialization of the concealed risk" is not contained in the Complaint, and the court cannot infer it from the four corners of the Complaint. Had this allegation been pleaded, it would have come closer to pleading loss causation. However, "matters outside the pleading may not be considered in deciding a Rule 12 motion to dismiss[.]" *Enervations, Inc. v. Minn. Mining & Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004). The Complaint and documents incorporated with the Complaint do not allege the relevant causal nexus, and the court will not superimpose these facts into the Complaint.

Fourth, Plaintiffs point to the allegation that the housing market was strong in 2004

and 2005, claiming it "corroborates that the Project was not viable from the start." Resistance Brief at 23. Like the first two allegations, this tends to show transaction loss, not causation loss. Additionally, this fact is not helpful to Plaintiffs. As *Dura* and *Schaaf* observed, "'the longer the passage of time between purchase and sale, the more likely that other factors caused the loss.'" *Schaaf*, 517 F.3d at 553 (quoting *Dura*, 544 U.S. at 343). In *Schaaf*, the Eighth Circuit Court of Appeals found the passage of roughly two and a half years between purchase and sale of the debentures "demonstrate[d] the inadequacy of the complaint." *Id.* In the instant action, the relevant passage of time runs from Plaintiffs' purchase of the Bonds in November of 2003 until default in November of 2007, approximately four years. Even if the court assumes, as Plaintiffs allege, that the market was strong in 2004 and 2005, the time period between the end of the strong economy in 2005 and default in 2007 allowed ample opportunity for other factors to cause Plaintiffs' loss, such as a slowdown in the market. Such a change in economic circumstances "could defeat a plaintiff's attempt to prove loss causation and give added significance to the passage of time." *Id.* (citing *Dura*, 544 U.S. at 342-43). Fifth, Plaintiffs argue Defendants are trying to "cover their tracks" by laying the blame for Plaintiffs' damages on declining real estate values. Plaintiffs argue these declining values are not the cause of their loss. This may be true; but, it is irrelevant to the Motions. What controls this question is whether Plaintiffs *pleaded* loss causation, not whether or not it can be proved. Fed. R. Civ. P. 12(b)(6).

Finally, Plaintiffs argue their allegation that Defendants' "acts were a proximate cause of damage to bondholders" suffices for purposes of pleading loss causation. Resistance Brief at 22 (citing Complaint at ¶¶ 112, 149, 164, 188 & 211). Although the court accepts all factual allegations in the Complaint as true for purposes of the Motions, it "giv[es] no effect to conclusory allegations of law." *Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007) (citing *Mattes v. ABC Plastics, Inc.*, 323

F.3d 695, 698 (8th Cir. 2003)). Plaintiffs' conclusory legal allegation of the existence of proximate cause does not satisfy the pleading requirement for loss causation.

Because the court finds Plaintiffs failed to plead loss causation for their federal securities claims, the court shall grant these portions of the Motions and dismiss Counts I, VI, IX, XIII, XVI and XXI from the Complaint.

### C. Miscellaneous Arguments as to Federal Securities Claims

Defendants also argue the court should dismiss the Complaint because Plaintiffs failed to adequately allege scienter. The City argues the court should dismiss the Complaint because Plaintiffs failed to properly allege the City was a "controlling person" for purposes of control person liability under 15 U.S.C. § 78t. MacDonald, Wilder, Tiplady, Grout, Miller and the Authority argue the federal securities claims ought to be dismissed against them because Plaintiffs failed to properly specify each allegedly misleading statement or omission. The Authority, Tiplady, Miller and Grout also argue the federal securities claims ought to be dismissed because Plaintiffs "cannot establish loss causation as a matter of law due to the intervening market conditions between when they purchased the [B]onds and when they commenced this lawsuit." Authority's Brief in Support of Motion at 18. The court finds it need not address these arguments in light of the independent bases for dismissal of the federal securities claims discussed above.

### D. Supplemental Subject-Matter Jurisdiction

As discussed above, the court shall dismiss all of Plaintiffs' federal securities claims over which it has original subject-matter jurisdiction. The remaining claims are state-law claims over which the court may choose to exercise jurisdiction. The court may exercise supplemental jurisdiction over claims for which it does not have original jurisdiction "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy[.]" 28 U.S.C. § 1367(a). However, the court may decline to exercise supplemental jurisdiction if it "has dismissed all claims over which it

has original jurisdiction." *Id.* § 1367(c)(3). "The Supreme Court has noted that 'in the usual case in which all federal[]law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine [. . .] will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Johnson v. City of Shorewood, Minn.*, 360 F.3d 810, 819 (8th Cir. 2004) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). Accordingly, the court declines to exercise jurisdiction over Plaintiffs' state law claims. In doing so, the court dismisses without prejudice the last of the claims in the Complaint, and it shall dismiss the Complaint in its entirety.

### E. Miscellaneous Motions

The Motions also seek to (1) dismiss a number of Plaintiffs' state law claims pursuant to Rule 12(b)(6), (2) dismiss certain Defendants from the instant action due to lack of personal jurisdiction and (3) transfer venue to the District of Minnesota. Because the court shall dismiss the Complaint as discussed above, the court need not consider these arguments.

### VII. CONCLUSION

In light of the foregoing, the court hereby **ORDERS**:

(1)     the Motions (docket nos. 34, 36, 37 and 38) are **GRANTED**;

(2)     Counts I, VI, IX, XIII, XVI and XXI are **DISMISSED WITH PREJUDICE**;

(3)     Counts II, III, IV, V, VII, VIII, X, XI, XII, XVII, XVIII, XIX, XX, XXII, XXIII and XXIV are **DISMISSED WITHOUT PREJUDICE**; and

(4)     the Complaint (docket no. 1) is **DISMISSED**.

**IT IS SO ORDERED.**

**DATED** this 18th day of September, 2008.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA